IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-CV-00656 (JDB) |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

## SEVENTH DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia. I

have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to

July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that

capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures,

appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy

Judge Advocate at various commands and routinely worked with FOIA matters. I am also an

attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 254

employees who staff a total of ten (10) units and two field operational service center units whose

collective mission is to effectively plan, develop, direct, and manage responses to requests for

access to FBI records and information pursuant to the FOIA; Privacy Act of 1974 ("PA");

Executive Order 12958, as amended; Presidential, Attorney General and FBI policies and

procedures; judicial decisions; and Presidential and Congressional directives. The statements

contained in this declaration are based upon my personal knowledge, upon information provided

to me in my official capacity, and upon conclusions and determinations reached and made in

accordance therewith. My responsibilities also include the review of FBI information for

classification purposes as mandated by Executive Order ("E.O.") 12958, as amended,[1] and the

preparation of declarations in support of Exemption 1 claims under the FOIA.[2] I have been

designated by the Attorney General of the United States as an original classification authority and

a declassification authority pursuant to E.O. Order 12958, as amended, §§ 1.3 and 3.1.

(3)      Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am

aware of the FBI's response to the March 12, 2007 FOIA request of plaintiff Electronic Frontier

Foundation ("EFF") which seeks access to records concerning the FBI's use of National Security

Letters ("NSLs") in connection with the March 2007 report of the Office of Inspector General

("OIG"), United States Department of Justice ("DOJ"), entitled "A Review of the Federal Bureau

of Investigation's  Use of National Security Letters" ("OIG Report"); and more generally,

internal FBI policies governing the use of NSLs.

(4)      This seventh declaration supplements, and hereby incorporates, my previous six

---

[1]  60 Fed. Reg. 19825 (1995), and 68 Fed. Reg. 15315 (2003).

[2]  5 U.S.C. § 552 (b)(1).

declarations submitted in this case. The "[First] Hardy Declaration," dated April 24, 2007, provided the Court and plaintiff with an overview of RIDS and the then existing backlog of FOIA and Privacy Act requests, a description of the search for and voluminous number of records potentially responsive to plaintiff's FOIA request, and an explanation for the delays associated with the FBI's processing of plaintiff's FOIA request. See [First] Hardy Declaration, ¶¶ 21-25. The "Second Hardy Declaration," dated May 25, 2007, described the status of the collection, review and processing of potentially responsive documents. The "Third Hardy Declaration," dated June 27, 2007, addressed the status of rolling releases made in accordance with an Order issued by the Court on June 15, 2007. The "Fourth Hardy Declaration," dated August 14, 2007, provided the Court and plaintiff with updated status of releases made as required by the June 15, 2007 Court Order, and as amended by the Court's Minute Order of June 28, 2007. The "Fifth Hardy Declaration," dated December 21, 2007, and the "Sixth Hardy Declaration," dated April 16, 2008, provided the Court and plaintiff with an updated status of releases made pursuant to the Court's August 23, 2007 Order, which required defendant to file a report every 120 days "detailing the status of the ongoing processing of Plaintiff's request."

(5)   The FBI originally reviewed a total of approximately 39,206 pages potentially responsive to plaintiff's request, out of which approximately 26,666 pages were released in full or part, approximately 1329 pages were withheld in full pursuant to applicable FOIA exemptions, approximately 8092 pages were withheld in full as duplicates, approximately 2525 pages were withheld in full because they were outside the scope of plaintiff's request, and approximately 594 pages were referred in their entireties to other government agencies for direct response to plaintiff.  These documents were released over a 16-month period on a monthly basis with the

3

first release made by letter dated July 5, 2007, and the last release made by letter dated October 6, 2008. Given the large volume of pages at issue in this case, on July 30, 2009, this Court ordered the FBI to choose a sample consisting of 300 pages representative of the exemptions asserted in this case and the categories of documents requested in plaintiff's FOIA request and the plaintiff was ordered to choose 100 pages in order to form a sample which would serve as the basis for this Vaughn declaration, in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

(6) This declaration, which is being submitted in compliance with the Court's July 30, 2009 Order in support of defendant's motion for summary judgment, will provide the Court and plaintiff with an explanation for the procedures used in reviewing and processing the sample pages, and a justification for the FBI information which has been withheld from disclosure in full or in part pursuant to FOIA Exemptions 1, 2, 3, 4, 5, 6, 7(A), 7(C), 7(D) and 7(E), 5 U.S.C. §§ (b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

## NATIONAL SECURITY LETTERS ("NSLs")

(7) NSLs -- the central subject of plaintiff's FOIA request -- are indispensable investigative tools that serve as building blocks in many FBI counterterrorism and counterintelligence investigations. NSLs have various uses, including obtaining evidence to support Foreign Intelligence Surveillance Act ("FISA") applications for electronic surveillance, pen register/trap and trace devices, or physical searches; developing communication or financial links between subjects of FBI investigations and between those subjects and others; providing evidence to initiate new investigations, expand national security investigations, or enabling agents to close investigations; providing investigative leads; and corroborating information

4

obtained by use of other investigative techniques.

(8)     NSLs can be used early in a national security investigation to develop leads and to determine a subject's associates and financial dealings as well as to remove individuals from suspicion.  The USA PATRIOT Act[3] changed the standard for obtaining an NSL and altered the FBI approval levels.  Subsequently, NSLs have become increasingly important investigative tools in national security cases.

(9)     The DOJ OIG has issued two reports summarizing its examination of the FBI's use of NSLs.  The first report entitled, "A Review of the Federal Bureau of Investigation's Use of National Security Letters" was issued in March 2007.  The second report, entitled, "A Review of the FBI's Use of National Security Letters: Assessment of Corrective Actions and Examination of NSL Usage in 2006," was issued in March 2008.[4]

### CHRONOLOGY OF ADMINISTRATIVE AND COURT PROCEEDINGS

(10)     Although the administrative correspondence associated with this FOIA request has been discussed in prior declarations, for the ease and convenience of the Court and plaintiff, the administrative history is set forth in detail below.

(11)     In a letter dated March 12, 2007, plaintiff submitted a request by facsimile to FBIHQ for records concerning the FBI's use of NSLs.[5]  **(See Exhibit A.)**

---

[3]  The term "USA PATRIOT Act" is an acronym for the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

[4]  Both reports can be found on the internet at www.justice.gov/oig/reports/FBI/index.htm.

[5]  Specifically, plaintiff's request was for "agency records (including but not limited to electronic records) from January 1, 2003 to the present" regarding the following ten categories of NSL-related records:

(12)     In a letter dated March 12, 2007, plaintiff submitted a request by facsimile for

_____

1.      All records discussing or reporting violations or potential violations of statutes, Attorney General guidelines, and internal FBI policies governing the use of NSLs, including, but not limited to:

      a.      Correspondence or communications between the FBI and the Privacy and Civil Liberties Oversight Board concerning violations or potential violations of statues, Attorney General guidelines, and internal FBI policies governing the use of NSLs; and

      b.      Correspondence or communications between the FBI and Department of Justice Office of the Inspector General concerning violations or potential violations of statutes, Attorney General guidelines, and internal FBI policies governing the use of NSLs;

2.      Guidelines, memoranda or communications addressing or discussing the integration of NSL data into the FBI's Investigative Data Warehouse;

3.      Contracts between the FBI and three telephone companies (as referenced in page 88 of the Inspector General's report), which were intended to allow the Counterterrorism Division to obtain telephone toll billing data from the communications industry as expeditiously as possible;

4.      Any guidance, memoranda or communications discussing the FBI's legal authority to issue exigent letters to telecommunications companies, and the relationship between such exigent letters and the FBI's authority to issue NSLs under the Electronic Communications Privacy Act;

5.      Any guidance, memoranda or communications discussing the application of the Fourth Amendment to NSLs issued under the Electronic Communications Privacy Act;

6.      Any guidance, memoranda or communications interpreting "telephone toll billing information" in the context of the Electronic Communications Privacy Act;

7.      Any guidance, memoranda or communications discussing the meaning of "electronic communication" in the context of the Electronic Communications Privacy Act;

8.      Copies of sample or model exigent letters used by the FBI's Counterterrorism Division;

9.      Copies of sample or model NSL approval requests used by the FBI's Counterterrorism Division; and

10.     Records related to the Counterterrorism Division's Electronic Surveillance Operations and Sharing Unit (EOPS).

We note that plaintiff's requests were numbered 1-10 in its original FOIA request, but the categories were labeled A-J in plaintiff's complaint in this case, as referenced in this Court's July 30, 2009 Order.  As such, request number 1 is the same as request category A, request number 2 is the same as request category B, and so forth.

expedited FOIA processing of its request to the DOJ Office of Public Affairs (OPA).  **(See Exhibit B.)**

(13)    The FBI acknowledged plaintiff's FOIA request and assigned it FOIPA Request No. 1073946, in a letter dated March 29, 2007.  **(See Exhibit C.)**  In addition, the FBI informed plaintiff that it was searching for the records requested and would inform plaintiff of the results "as soon as possible."

(14)    In a letter dated March 30, 2007, the FBI acknowledged plaintiff's request for expedited treatment of its FOIA request to the OPA and advised plaintiff that the FBI had been notified by the Director of OPA that plaintiff's request for expedited processing was granted. **(See Exhibit D.)**

(15)    Plaintiff filed this lawsuit on April 10, 2007 seeking injunctive and declaratory relief.

(16)    Pursuant to this Court's June 15, 2007 Order, the FBI made its first release of documents in this case on July 5, 2007, followed by 15 separate releases of documents to plaintiff on a monthly basis, with the last release being made by on October 6, 2008.[6] **(See Exhibits E-T.)**

(17)    In a letter dated December 5, 2008, in accordance with the Court's Order dated

_____

[6] These release letters are dated as follows: July 5, 2007 (see Exhibit E); August 6, 2007 (see Exhibit F); September 5, 2007 (see Exhibit G); October 5, 2007 (see Exhibit H); November 5, 2007 (see Exhibit I); December 5, 2007 (see Exhibit J); January 4, 2008 (see Exhibit K); February 4, 2008 (see Exhibit L); March 5, 2008 (see Exhibit M); April 4, 2008 (see Exhibit N); May 5, 2008 (see Exhibit O); June 4, 2008 (see Exhibit P); July 7, 2008 (see Exhibit Q); August 5, 2008 (see Exhibit R); September 4, 2008 (see Exhibit S); and October 6, 2008 (see Exhibit T).

July 1, 2008, the FBI provided plaintiff with an electronic copy of the processed Bates-stamped documents. **(See Exhibit U.)**

(18)    In a letter dated September 30, 2009, in accordance with the Court's Order of July 30, 2009, the FBI notified plaintiff of its selection of 314 pages to be used as part of the sample for purposes of this Vaughn declaration. **(See Exhibit V.)**

(19)  In a letter dated October 16, 2009, defendant notified plaintiff that 317 pages inadvertently were not Bates-stamped prior to their release on December 5, 2008 and provided plaintiff's with the new Bates-stamped pages. See supra ¶ 17. **(See Exhibit W.)**

(20)  In an e-mail dated October 29, 2009, plaintiff notified FBI's counsel of its selection of 100 Bates-stamped pages to be used as part of the sample for this Vaughn declaration. **(See Exhibit X.)**

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(21)    The CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). Certain records in the CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are maintained in those field offices. Although the CRS is primarily designed to serve as an investigative tool, the FBI utilizes the CRS to conduct searches that are likely to yield documents responsive to FOIA and Privacy Act requests. The mechanism that the FBI uses to

8

search the CRS is the Automated Case Support System ("ACS").

(22)     Access to the CRS is obtained through the General Indices, which are arranged in
alphabetical order. The General Indices consist of index cards on various subject matters that are
searched either manually or through the automated indices. The entries in the General Indices
fall into two categories:

> (a) A "main" entry -- A "main" entry, or "main"file, carries the name
> corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry -- A "reference" entry, sometimes called a "cross-
> reference" is generally only a mere mention or reference to an individual,
> organization, or other subject matter, contained in a document located in another
> "main" file on a different subject matter.

(23)     Access to the CRS files in FBI field offices is also obtained through the General
Indices (automated and manual), which are likewise arranged in alphabetical order, and consist
of an index on various subjects, including the names of individuals and organizations. Searches
made in the General Indices to locate records concerning a particular subject, such as National
Security Letters, are made by searching the subject requested in the index. FBI field offices have
automated indexing functions.

(24)     On or about October 16, 1995, the ACS system was implemented for all field
offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that
were previously automated. Because the CRS cannot electronically query the case files for data,
such as an individual's name or social security number, the required information is duplicated
and moved to the ACS so that it can be searched. Over 105 million records from the CRS were
converted from automated systems previously utilized by the FBI. Automation did not change
the CRS; instead, automation has facilitated more economic and expeditious access to records

maintained in the CRS.

(25)     ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a)  Investigative Case Management ("ICM") - ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case.  The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"). (formerly known as Auxiliary Offices.)  When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is utilized by all FBI field offices, Legats, and FBIHQ that are conducting or assisting in the investigation.  Using a fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation; "HQ" is the abbreviated form used for the OO of the investigation, which in this case is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

(b)  Electronic Case File ("ECF") - ECF serves as the central electronic repository for the FBI's official text-based documents.  ECF supports the universal serial concept, in that only the creator of a document serializes it into a file.  This provides a single-source entry of serials into the computerized ECF system.  All original serials are maintained in the OO case file.

(c)  Universal Index ("UNI") - UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases.  Only the OO is required to index; however, the LOs may index additional information as needed.  UNI, an

index of approximately 108.7 million records, functions to index names to cases, and to search

names and cases for use in FBI investigations. Names of individuals or organizations are

recorded with identifying applicable information such as date or place of birth, race, sex, locality,

Social Security number, address, and/or date of event.

(26)    The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the FBI Special Agent ("SA") assigned to work on the

investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and

the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that

information considered to be pertinent, relevant, or essential for future retrieval. Without a "key"

(index) to this enormous amount of data, information essential to ongoing investigations could

not be readily retrieved. The FBI files would thus be merely archival in nature and could not be

effectively used to serve the mandated mission of the FBI, which is to investigate violations of

federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which

the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on

a particular subject matter or individual, i.e., NSLs.

## SEARCHES FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(27)    In response to plaintiff's request for information concerning NSLs, the FBI

employed two mechanisms as part of its search efforts to identify records responsive to plaintiff's

request. In order to locate records responsive to plaintiff's request, the FBI 1) conducted a

standard search for records in the CRS; and 2) performed an individualized inquiry of the

divisions within FBIHQ most likely to have potentially responsive records by issuing an

Electronic Communication ("EC"), or memorandum, requesting that those FBIHQ offices

11

conduct a search for records responsive to plaintiff's FOIA request.

(28)    More specifically, on or about March 29, 2007, the FBI initiated a search for

records in CRS using the subject matter at issue in this case to locate any main investigatory files

or references maintained at FBIHQ using multiple variations of the term "National Security

Letters." The date parameters for the search were January 1, 2003 to March 29, 2007 -- the

search cut-off date for the request. The FBI was unable to locate any FBIHQ main files as a

result of this search.

(29)    In addition, the FBI conducted an individualized inquiry (in addition to its search

of the CRS system) of particular offices, sections and divisions at FBIHQ.  On April 5, 2007, the

FBI prepared and circulated an EC to FBIHQ divisions most likely to possess records responsive

to plaintiff's FOIA request, including the Office of the Director, National Security Branch,

Counterterrorism Division, Inspection Division, and Office of the General Counsel.  The EC

requested the personnel of these designated divisions to conduct a thorough search of any

documents in their possession, including e-mails, responsive to plaintiff's request.  Additional

details concerning the identification and scoping of records identified as potentially responsive as

a result of the EC have been described in my six previous declarations. See supra, ¶ 4.  After

RIDS reviewed the documents generated by this individualized search, it was determined that a

total of approximately 39,206 pages were responsive and accordingly processed this collection,

out of which it released approximately 26,666 pages.  Material was withheld in full or in part

pursuant to 5 U.S.C. 552 §§ (b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C),

(b)(7)(D), and (b)(7)(E).

12

## DESCRIPTION OF SAMPLE SELECTION PROCEDURE

(30)   Pursuant to this Court's July 30, 2009 Order, a sample selection of approximately 415 pages, approximately 315 pages which were selected by the FBI and 100 pages which were selected by plaintiff, form the basis for this Vaughn declaration.  In choosing the pages for the sample, the Court ordered the FBI to ensure that its 300-page selection was representative of the specific document request categories outlined in plaintiff's complaint that made up the original FOIA request (Compl. ¶10), as well as the applicable FOIA exemptions asserted throughout the 39,206 pages.[7]  As a result of this categorization process, the FBI determined the following: out of the 39,206 pages processed, approximately 27,995 pages were either released in full or were withheld in full or in part pursuant to applicable FOIA exemptions.[8]  Out of these 27,995 pages, 94.83 % of the pages were responsive to category A of plaintiff's request, 0.16% were responsive to category B, 0.09% were responsive to category C,  3.61% were responsive to category D, 0.39% were responsive to category E, 1.17% were responsive to category F, 1.29% were responsive to category G, 0.19% were responsive to category H, 0.96% were responsive to category I, and 0.09% were responsive to category J.  With respect to the representation of the exemptions throughout the 27,995 pages at issue, the FBI determined the following: out of the

---

[7]  In order to comply with the Court's order the FBI engaged in a monumental effort for several weeks.  Unlike civil discovery under the Federal Rules of Civil Procedure, it is not the responsibility of an agency responding to a FOIA request to identify with specificity which documents are responsive to each part of a multi-part FOIA request.  In order to comply with the specific requirements of the Order and produce the statistics contained in this paragraph, the FBI assigned a team of ten employees who spent several weeks compiling this information.

[8]  Of the remaining 11,211 pages processed, 8092 pages were withheld in full and not released to plaintiffs because they were duplicates of other documents within the 27,995 pages, 2525 pages were withheld as being out of the scope of plaintiff's request, and 594 pages were directly referred to other government agencies for direct response to plaintiff.

27,995 pages, 50.52% contained information withheld for Exemption (b)(1), 75.55% contained

information withheld pursuant to Exemption (b)(2), 0.13% contained information withheld

pursuant to Exemption (b)(3), 23.93% contained information withheld pursuant to Exemption

(b)(4), 19.37% contained information withheld pursuant to Exemption (b)(5), 77.24% contained

information withheld pursuant to Exemption (b)(6), 33.80% contained information withheld

pursuant to Exemption (b)(7)(A), 77.22% contained information withheld pursuant to Exemption

(b)(7)(C), 26.43% contained information withheld pursuant to Exemption (b)(7)(D), and 63.84%

contained information withheld pursuant to Exemption (b)(7)(E).  In light of the frequency with

which multiple exemptions appeared on a single page, the FBI had to select 314 pages instead of

the court-ordered 300 pages in order to ensure that the sample adequately represented the

categories and the exemptions at the frequency with which they appear in the entire collection.

As a result, the categories and exemptions are represented in the following manner: 293 pages in

the sample are responsive to category A, two (2) pages are responsive to category B, one (1) page

is responsive to category C, 11 pages are responsive to category D, four (4) pages are responsive

to category E, six (6) pages are responsive to category F, five (5) pages are responsive to category

G, one (1) page is responsive to category H, five (5) pages are responsive to category I, and three

(3) pages are responsive to category J.  As for the asserted exemptions, 172 pages contain

Exemption (b)(1), 266 pages contain Exemption (b)(2), one (1) page contains Exemption (b)(3),[9]

---

[9] In the chart it provided to plaintiff on September 30, 2009, the FBI indicated that three
Bates-stamped pages in its selection were withheld pursuant to Exemption (b)(3) - NSL VIO
1700, 3107, and 3109.  In preparing this declaration, however, the FBI determined that these
Bates-stamped pages were inadvertently designated incorrectly as having been withheld pursuant
to Exemption (b)(3).  Two of these pages, NSL-VIO 3107 and NSL-VIO 3109, should have been
designated as withheld pursuant to Exemption (b)(2).  In addition, the FBI determined that
Exemption (b)(3) was improperly asserted on Bates-stamped page NSL-VIO 1700, and hereby

120 pages contain Exemption (b)(4), 64 pages contain Exemption (b)(5), 239 pages contain Exemption (b)(6), 101 pages contain Exemption (b)(7)(A), 232 pages contain Exemption (b)(7)(C), 127 pages contain Exemption (b)(7)(D), and 121 pages contain Exemption (b)(7)(E).

## EXPLANATION OF CODED FORMAT USED FOR THE JUSTIFICATION OF DELETED MATERIAL

(31)    All documents were processed by RIDS to achieve maximum disclosure consistent with the access provisions of the FOIA. The FBI has made every effort to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material. Moreover, the FBI has taken all reasonable efforts to ensure that no segregable, nonexempt portions were withheld from plaintiff. Any further description of the information withheld could identify the very material which the FBI seeks to protect.

(32)    As stated earlier, this Vaughn declaration is based on a total of 415 sample pages, copies of which are attached hereto as **Exhibit Y.** Out of these 415 pages, 23 pages have been released in full, 341 pages have been released in part, and 51 pages have been withheld in full, pursuant to FOIA Exemptions 1, 2, 3, 4, 5, 6, 7(A), 7(C), 7(D) and 7(E). The 51 pages withheld in their entireties are represented by the insertion of deleted page sheets. Each page of **Exhibit Y** is Bates-stamped.

(33)    In addition, with the exception of Exemptions 1 and 7(A), copies of the designated documents contain, on their face, coded categories of exemptions which detail the

---

withdraws its assertion of Exemption (b)(3) on that page. In order to ensure adequate representation of Exemption (b)(3) in the sample, the FBI has selected another page from the release containing a (b)(3) Exemption. This replacement page is Bates-stamped NSL-VIO 147 and is included in Exhibit Y.

specific nature of the information withheld pursuant to FOIA.  The coded categories are provided to aid the Court's and plaintiff's review of the FBI's explanations of FOIA exemptions used to withhold the protected material.  A review of this information will reveal that all material withheld is exempt from disclosure pursuant to FOIA exemptions, or it is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

(34)    Thus, each withholding of information (other than for Exemptions 1 and 7(A)) is accompanied by a code that corresponds to the categories listed below.  For example, if "(b)(7)(C)-1" appears on the page, the "(b)(7)(C)" designation refers to "Exemption (b)(7)(C)" of the FOIA concerning "Unwarranted Invasion of Personal Privacy."  The subcategory "1" narrows the main category into the more specific subcategory "Names and/or Identifying Information of FBI Special Agents."[10]  The specific coded categories of exemptions used in the 415-page sample are as follows:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(1)** | **CLASSIFIED INFORMATION** |
| (b)(1) | Information Properly Classified by an FBI Classification Authority Pursuant to Executive Order 12958, As Amended |

---

[10] Due to the large number of pages processed in this case, RIDS redacted information that was the exact duplicate of information processed earlier within the release.  If the entire page was a duplicate, it was removed.  If only portions of information within a document were duplicative, then those portions were redacted and it was noted on the page that the information was removed as duplicative.  Such pages can be found in the sample selection on the following Bates-stamped pages:  NSL VIO 14291, 14292, 14295, 20822-20823 and 31796.  For ease of reference, the respective original coded information was provided on the following Bates-stamped pages:  NSL VIO 14286, 14287, 14283, 20820, 20821, and 31776-31777.

16

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(2)** | **INTERNAL AGENCY RULES AND PRACTICES** |
| (b)(2)-1 | Information Pertaining to Investigative Techniques and Procedures |
| (b)(2)-2 | Secure/Non-Secure Telephone and Facsimile Numbers of FBI Personnel |
| (b)(2)-3 | FBI File Numbers |
| (b)(2)-4 | Secure FBI Address |
| (b)(2)-5 | Secure Intranet or E-mail Address of FBI Employee |
| (b)(2)-6 | Code Name of FBI Investigation |
| (b)(2)-7 | Secure/Non-Secure Telephone or Facsimile Number of Non-FBI Federal Government Personnel |
| (b)(2)-8 | Confidential Source Symbol Number |
| (b)(2)-9 | Confidential Source File Number |
| **Category (b)(4)** | **TRADE SECRETS AND COMMERCIAL OR FINANCIAL INFORMATION** |
| (b)(4)-1 | Trade Secrets |
| **Category (b)(5)** | **PRIVILEGED INFORMATION** |
| (b)(5)-1 | Attorney-Client Privilege |
| (b)(5)-2 | Deliberative Process Privilege |
| **Categories (b)(6) and (b)(7)(C)** | **CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of FBI Special Agents and Support Personnel |
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information of Third Parties of Investigative Interest |
| (b)(6)-3 and (b)(7)(C)-3 | Name and/or Identifying Information of Third Parties Merely Mentioned |

17

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **(b)(6)-4 and (b)(7)(C)-4** | Names and/or Identifying Information Concerning Non-FBI Federal Government Personnel |
| **(b)(6)-5 and (b)(7)(C)-5** | Names and/or Identifying Information of Third Parties Who Provided Information to the FBI |
| **(b)(6)-6 and (b)(7)(C)-6** | Name and/or Identifying Information Regarding a Third-Party Victim |
| **(b)(6)-7 and (b)(7)(C)-7** | Name and/or Identifying Information of a Commercial Institution Employee |
| **Category (b)(7)(A)** | **PENDING LAW ENFORCEMENT PROCEEDINGS** |
| **(b)(7)(A)** | Information Which, if Disclosed, Could Reasonably be Expected to Interfere with Pending Law Enforcement Proceedings |
| **Category (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |
| **(b)(7)(D)-1** | Names and/or Identifying Information Provided by a Corporate Entity or an Individual Under an Express Assurance of Confidentiality |
| **(b)(7)(D)-2** | Foreign Government Agency Information (Express Confidentiality) |
| **(b)(7)(D)-3** | Names and/or Identifying Information Provided by an Individual Under an Implied Assurance of Confidentiality |
| **(b)(7)(D)-4** | Confidential Source File Number |
| **Category (b)(7)(E)** | **INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| **(b)(7)(E)-1** | Information Pertaining to Investigative Techniques and Procedures |

## JUSTIFICATION FOR NON-DISCLOSURE UNDER FOIA

(35)    The paragraphs that follow explain the FBI's rationale for withholding each

particular category of information under the specific exemption categories described above.

18

## EXEMPTION (b)(1)
## CLASSIFIED INFORMATION

(36)    The FBI's analysis of the withholding of classified information contained in these

documents is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552 (b)(1).

Exemption (b)(1) protects from disclosure those records that are:

> (A)    specifically authorized under criteria established by an Executive Order
> to be kept secret in the interest of national defense or foreign policy; and

> (B)    are in fact properly classified pursuant to such Executive Order.

(37)    The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency

records consists of two significant steps. First, the FBI must determine whether the information

contained in the records is information that satisfies both the substantive and procedural criteria

of the applicable Executive Order governing the classification and protection of national security

information; and second, complies with the various substantive and procedural criteria of the

Executive Order. Executive Order ("E.O.") 12958, as amended, governs the classification and

protection of information that affects the national security,[11] and prescribes various substantive

and procedural criteria. I am bound by the requirements of E.O. 12958, as amended, when

making classification determinations.

(38)    In order for information to be properly classified, and thus properly withheld from

disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in

---

[11] Section 6.1(y) of E.O. 12958, as amended, defines "National Security" as "the national
defense or foreign relations of the United States."

19

E.O. 12958, as amended, §1.1 (a):

> (1)     an original classification authority is classifying the information;
>
> (2)     the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3)     the information falls within one or more of the categories of information listed in §1.4 of this order; and
>
> (4)     the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(39)     As I will explain in further detail below, in my role as an original classification

authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under

the control of the United States Government, is classified and requires a classification marking at

the "Secret" level since the unauthorized disclosure of this information reasonably could be

expected to cause serious damage to national security. See E.O. 12958, as amended, §1.2(a)(2).

In addition to these substantive requirements, certain procedural and administrative requirements

of E.O. 12958, as amended, must be followed before information can be considered to be

properly classified, such as, proper identification and marking of documents. In particular, I

made certain that all procedural requirements of E.O. 12958, as amended, were followed:

> (1)     each document was marked as required and stamped with the proper classification designation;[12]
>
> (2)      each document was marked to indicate clearly which portions are

---

[12] E.O. 12958, as amended, §§ 1.6 (a)(1) - (5).

20

classified, which portions are exempt from declassification as set forth in
E.O. 12958, as amended, §1.4 (c), and which portions are unclassified;[13]

(3)     the prohibitions and limitations on classification specified in E.O. 12958,
        as amended, § 1.7, were adhered to;

(4)     the declassification policies set forth in E.O. 12958, as amended, §§3.1
        and 3.3 were followed; and

(5)     any reasonably segregable portions of these classified document that did
        not meet the standards for classification under E.O. 12958, as amended,
        were declassified and marked for release, unless withholding was
        otherwise warranted under applicable law.[14]

## FINDINGS OF DECLARANT

(40)    With the above requirements in mind, I personally and independently examined

the FBI information withheld pursuant to Exemption (b)(1) in the 415 page-sample.  As a result

of this examination, I determined that this classified information continues to warrant

classification at the "Secret" level, and is exempt from disclosure pursuant to E.O. 12958, as

amended, §1.4, category (c) intelligence activities or methods and intelligence sources, and (d)

foreign relations or foreign activities of the U.S., as the unauthorized disclosure of the

information could reasonably be expected to cause serious damage to the national security.

---

[13]  E.O. 12958, as amended, § 1.6 (a)(5)(c).

[14]  5 U.S.C. § 552(b) provides, in part, that "[a]ny reasonably segregable portion of a
record shall be provided to any person requesting such record after deletion of the portions which
are exempt under this subsection."  In this case, the information at issue has been carefully re-
examined.  Based on our re-review, we have determined that no additional reasonably segregable
portions may be declassified and released, as represented in Exhibit Y.

## INTELLIGENCE ACTIVITIES, SOURCES AND METHODS

(41)     E.O. 12958, as amended, §1.4 (c), exempts intelligence activities (including special activities), intelligence sources and methods, or cryptology.  An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest.  An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization.  An intelligence activity or method has two characteristics.  First, the intelligence activity or method -- and information generated by it -- is needed by U.S. intelligence/counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved.  Classified information is withheld on certain pages[15] to protect an intelligence method utilized by the FBI for gathering intelligence data.

(42)     The classification redactions were made to protect from disclosure information that would reveal the actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign

---

[15] Exemption (b)(1) has been asserted to protect an intelligence method utilized for gathering intelligence data on the following pages:  NSL VIO - 4, 5, 7-9, 24-25, 208-210, 298, 497-499, 699, 799, 899, 997, 1401, 1600, 1800, 1900-1903, 2097-2100, 2299-2300, 9850-9855, 10726, 10729, 10730-10731, 10734-10735, 10738-10740, 10742-10765, 12352-12354, 12356-12359, 12361-12364, 12366-12369, 12372, 12379, 12386, 12395, 12400, 12406, 14283, 15347-15351, 15354-15355, 15357, 15361-15363, 15467, 17949, 17950-17960, 19490, 19644, 23443, 23447, 23450, 23454, 27100, 27103, 27106, 27109, 29099-29100, 36331, 36805, 36808-36812, 36814-36817, 36819-36820, 38437-38439, and 38441-38471.

counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets. The intelligence activities or methods detailed in the withheld information are effective means for the FBI to gather, store or disseminate intelligence information. The criteria utilized by the FBI in these instances to decide what actions by an individual or organization warranted the commencement of an investigation, or caused a certain activity to be given investigative attention over others, could be revealed through disclosure of these intelligence methods. The criteria applied and priorities assigned in these records are used in the FBI's present intelligence or counterintelligence investigations, and are in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations.

(43)    The information in these documents concerning activities and methods is very specific in nature and known to very few individuals. Disclosure of the specific information which describes these intelligence activities and methods -- and which are still used by the FBI today to gather intelligence information -- could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current methods and activities used; (2) disclosure would reveal current specific targets of the FBI's national security investigations; and (3) disclosure would reveal or determine the criteria used and priorities assigned to current intelligence or counterintelligence investigations. Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.

23

(44)    The FBI protected the following categories of information specific to intelligence

activities and methods because disclosure reasonably could be expected to cause serious damage

to the national security:  **First**, the withheld information contains file numbers that are assigned

to a specific intelligence activity or method.  **Second**, the withheld information contains

designations for a foreign counterintelligence squad or unit which targets specific individuals or

organizations of national security interest.  **Third**, the withheld information contains standard

FBI terminology or phraseology which appears in the most recent FBI investigations.  **Fourth**,

the withheld information contains the character of the case, which identifies the specific type of

intelligence activity directed at a specific target and the identity of the target of national security

interest.  **Fifth**, the withheld information contains an alpha designator that is inserted into file

numbers at the end of the FBI classification number.  **Sixth**, the withheld information contains an

acronym that identifies a specific intelligence method.  **Seventh**, the withheld information

identifies targets of foreign counterintelligence investigations.  **Eighth**, the withheld information

protects an intelligence source.  Below is a more detailed discussion of each of these categories.

## A. <u>File Numbers</u>

(45)    The classified information withheld on certain pages[16] includes FBI file numbers

assigned to specific intelligence activities, including channelization and dissemination

---

[16]  Exemption (b)(1) has been asserted to protect file numbers on the following pages:
NSL VIO - 4, 7, 24, 25, 100, 208-209, 298, 497-499, 699, 701, 799, 899, 1800, 1900-1903,
2098-2099, 2299-2301, 9850-9855, 10726, 10734, 10738, 10742, 10746, 10750, 10755, 10759,
10762, 10764, 12352, 12356, 12357, 12361-12363, 12367, 12372, 12379, 12386, 12395, 12406,
15351, 15354, 15358, 15467, 17949, 17951, 17955, 17957, 17959, 20727, 20733, 23447, 23450,
36333, 36805, 36817, 36819, 38441, and 38443-38471.

24

instructions. Their release would lead to exposure of the particular intelligence activities and methods at issue. Individual file numbers are assigned by FBIHQ and field offices and contain a geographical prefix or the originating office and case number, which includes the numerical characterization of the type of investigation followed by a chronological number assigned to a specific investigation or activity.

(46)   The disclosure of an intelligence file number in the aggregate will enable a hostile analyst to attribute any information released from the documents containing such a file number to that particular file. A hostile analyst can identify the specific intelligence activity by supplying further missing pieces. Hence, a partial mosaic of the activity begins to appear as more information is identified with the file leading to the exposure of actual current activities or methods. Disclosure of this file number will allow a hostile analyst, or anyone not privileged to this information, to patch bits and pieces of information together until the actual use of the application of the source or method can be determined. The identification of these intelligence sources or methods, which continues to furnish positive intelligence information to date, will severely limit its application. In addition, disclosure will inform hostile intelligence of the possible range of our intelligence capabilities, as well as the probable intelligence that the FBI has gathered, or can collect, concerning them. This knowledge provides potential or actual violators of the United States' national security laws a means of deflection or avoidance of lawful regulations. Disclosure will allow countermeasures to be implemented, making future operations more difficult, or compromise other ongoing planned intelligence operations. Accordingly, the release of the file numbers can lead to the exposure of the actual intelligence activity or method

25

utilized in FBI investigations, and can reasonably be expected to cause serious damage to
national security. The file numbers are properly classified at the "Secret" level and withheld
pursuant to E.O. 12958, as amended, §1.4 (c) and exempt from disclosure pursuant to Exemption
(b)(1).

## B. Squad/Units

(47)    The classified information withheld on certain pages[17] includes designations for
FBI foreign counterintelligence squads or the name of operational units which currently target
specific individuals and organizations of national security interest. For example, if a particular
squad number and/or designation is associated only with counterintelligence activities, any time
that squad number and/or designation is released would serve as an indicator that
counterintelligence activities are being conducted. The disclosure of these designations or the
operational unit name would enable hostile intelligence services to associate the presence of such
squads and operational unit in any FBI document or investigation with FBI counterintelligence
activity, thus enabling the foreign intelligence service to determine the presence of the FBI's
counterintelligence activity in a specific area. Disclosure of these designations or the operational
unit name would reveal the existence of a particular intelligence or counterintelligence operation,
as well as the nature, objectives, scope or thrust of the investigation, which would allow hostile
assessment of the area of target. This knowledge provides potential or actual violators of
United States national security laws a means of deflection or avoidance of lawful regulations.

---

[17] Exemption (b)(1) has been asserted to protect squad/unit information on the following
pages: NSL VIO - 2299, 20727, 20729, 20733 and 38438.

26

Disclosure will allow countermeasures to be implemented, making future operations more difficult, or compromise other ongoing planned intelligence operations. This would severely disrupt the FBI's intelligence gathering capabilities and severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws and to fight the war on transnational terrorism. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 12958, as amended, §1.4 (c) and exempt from disclosure pursuant to Exemption (b)(1).

## C. Standard Terminology/Phraseology

(48)   The classified information withheld on certain pages[18] contains standard terminology or phraseology which appears in the most recent FBI investigations. Disclosure of this information will reveal the scope and depth of the FBI's efforts in a particular intelligence investigation. Disclosure will reveal the limitations of the FBI's efforts in a particular investigation or the amount of resources or efforts that the FBI is willing to expend on this particular matter. This allows a target to determine what information has been learned concerning him and what additional steps may be expected. If the information described by this phraseology is shallow, yet the subject is heavily involved in matters under investigation, it alerts the subject to the fact that his activities may continue without fear or detection. Conversely, if the information is substantial, it will prompt the subject to alter his/her course of conduct. Although these results may not occur in the narrow context of this case, the results described are

---

[18] Exemption (b)(1) has been asserted to protect standard terminology and phraseology on the following pages: NSL VIO-4, 20727 and 20729.

likely to occur if information of this nature is routinely released. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 12958, as amended, §1.4 (c) and exempt from disclosure pursuant to Exemption (b)(1).

## D. **Character of the Case**

(49)   The classified information withheld on certain pages[19] identifies the character of a case for a specific type of intelligence activity directed at a specific target of national security interest. Disclosure of this specific information could reasonably be expected to cause serious damage to the national security, as it would (a) disclose a particular intelligence or counterintelligence investigation; (b) disclose the nature, scope or thrust of the investigation and (c) reveal the manner of acquisition of the intelligence or counterintelligence information. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 12958, as amended, §1.4 (c) and exempt from disclosure pursuant to Exemption (b)(1).

## E. **Alpha Designator**

(50)   The classified information withheld on certain pages[20] contains an alpha designator. Alpha designators are inserted into file numbers at the end of the FBI classification

---

[19]   Exemption (b)(1) has been asserted to protect information regarding the character of a case on the following pages:  NSL VIO - 1900-1903, 10726, 10729, 10734, 10738, 10746, 10759, 10762, 12357, 12363, 15358 and 24699.

[20]   Exemption (b)(1) has been asserted to protect alpha designators on the following pages: NSL VIO - 4, 7, 24-25, 100, 208-209, 298, 497-499, 699, 701, 799, 899, 1800, 1900-1903, 2098-2099, 2299-2300, 9850-9855, 10726, 10729, 10734, 10738, 10742, 10744, 10746, 10750, 10755, 10759, 10762, 10764, 12356-12357, 12361-12363, 12367, 12372, 12379, 12386, 12395, 15350- 15351, 15354, 15358, 15467, 17949, 17951, 17953, 17955, 17957, 17959, 20733, 23447, 23450, 36333, 36805, 36817, 36819, 38441, 38443- 38454, and 38456-38471.

28

number to specify a subset of the file classification for record-keeping purposes. The disclosure

of this information would identify an intelligence activity that is currently being used by the FBI

to obtain information on an individual or organization of national security interest. This

information is properly classified at the "Secret" level and withheld pursuant to E.O. 12958, as

amended, § 1.4 (c) and exempt from disclosure pursuant to Exemption (b)(1).

### F. Acronyms

(51)    The classified information withheld on certain pages[21] contain acronyms that

identify a specific intelligence method utilized by the FBI in its intelligence-gathering activities.

The disclosure of this information could permit hostile analysts to ascertain the specific nature of

the FBI's investigations. This information is properly classified at the "Secret" level and

withheld pursuant to E.O. 12958, as amended, §1.4 (c) and exempt from disclosure pursuant to

Exemption (b)(1).

### G. Foreign Counterintelligence Investigations

(52)    The classified information withheld on certain pages[22] identifies targets of current

FBI foreign counterintelligence investigations. The disclosure of this information could

---

[21] Exemption (b)(1) has been asserted to acronym information on the following pages: NSL VIO - 4, 2299, 20727, 20729, 27106.

[22] Exemption (b)(1) has been asserted to protect targets of foreign counterintelligence investigations on the following pages: NSL VIO - 4, 7-9, 25, 498, 699, 799, 899-900, 997-999, 1401, 1601, 1700-1701, 1800-1801, 1900-1901, 2100, 2299-2300, 9851-9854, 10726, 10730-10731, 10735-10736, 10738-10740, 10742-10743, 10746-10748, 10751-10753, 10756-10757, 10759, 10762-10765, 12352-12354, 12357-12359, 12364, 12366-12369, 12400, 12406, 14283-14290, 14293-14297, 15354-15355, 15357, 15359- 15363, 17949, 17951, 17953, 17955, 17957, 17959, 23443-23454, 27103-27104, 27105-27106, 27109, 29099-29100, 33998, 36332-36334, 36336, 36805, 36809, 36812, 36815-36817, 36819- 36820, 38438-38439, and 38441-38471.

reasonably be expected to cause serious damage to the national security as it would: (a) reveal the

actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the

intelligence gathering capabilities of the activity or method; and (c) provide an assessment of the

intelligence source penetration of a specific target during a specific period of time.  The release

of this information could permit hostile governments to appraise the scope, focus, location, target

and capabilities of the FBI's intelligence-gathering methods and activities, and allow hostile

agents to devise countermeasures to circumvent these intelligence activities or methods and

render them useless in providing intelligence information.  This would severely disrupt the FBI's

intelligence gathering capabilities.  This information is properly classified at the "Secret" level

and withheld pursuant to E.O. 12958, as amended, §1.4 (c), and exempt from disclosure pursuant

to Exemption (b)(1).

## H. **Intelligence Sources**

(53)    An intelligence source which requires continued classification is an individual

who provided or is currently providing information that pertains to national security matters, the

disclosure of which could reasonably be expected to result in damage to the FBI's intelligence

and counterintelligence-gathering capabilities.

(54)    My review disclosed that the information pertaining to a classified intelligence

source is likely to identify this source.[23]  The withheld information and material provided by -- or

which pertains to the source -- is specific in nature and, if disclosed, reasonably could be

------------------------------------------

[23]  Exemption (b)(1) has been asserted to protect intelligence source information on the
following pages:  NSL VIO - 4, 5, 999, 1603, 1900, 1601 and1603.

expected to reveal the identity of this source. I considered a number of factors in reaching this conclusion, including most importantly, the damage to the national security that would result from public identification of the sources utilized in intelligence investigations, and the effect on the FBI's ability to protect and recruit intelligence sources in the future.

(55)    Disclosure of the identities of FBI intelligence sources, regardless of whether they are active or inactive, alive or deceased, can reasonably be expected to cause current and potential intelligence sources to fear that their identities will be publicly revealed at some point, in spite of the FBI's present express or implied assurance of confidentiality. This disclosure of sources' identities could jeopardize the physical and emotional well-being of the source or the source's family or associates, subject them to public ridicule and/or ostracism, and even pose a threat to their lives.

(56)    Thus, the release of information I determined to be source-identifying could reasonably be expected to cause serious damage to the national security by causing current intelligence sources to cease providing information, and discourage potential intelligence sources from cooperating with the FBI for fear their identities will be publicly revealed at some point. Such a source reaction would eliminate one of the most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to damage the national security through violation of the United States criminal and national security laws. The classified information provided by intelligence sources on certain pages is properly classified at the "Secret" level and withheld pursuant to E.O. 12958, as amended, §1.4 (c) and exempt from disclosure pursuant to Exemption (b)(1).

31

## FOREIGN RELATIONS OR FOREIGN ACTIVITIES

(57)    Section 1.4 (d) of E.O. 12958, as amended, protects information from disclosure if

its release would reveal foreign relations or foreign activities of the United States, including

confidential sources.  Information that affects the foreign relations of the United States, much

like foreign government information, does not lose its sensitivity with the passage of time.  The

delicate liaison established between the United States and these foreign governments could be

severely damaged should the United States disclose these investigations.  As a result, this

information must be handled with care so as not to jeopardize the fragile relationships that exist

among the United States and certain foreign governments.[24]  The unauthorized disclosure of

information concerning foreign relations or foreign activities of the United States can reasonably

be expected to lead to diplomatic or economic retaliation against the United States; identify the

target, scope or time frame of intelligence activities of the United States in or about a foreign

country, which may result in the curtailment or cessation of these activities; enable hostile

entities to assess United States intelligence-gathering activities in or about a foreign country and

devise countermeasures against these activities; or compromise cooperative foreign sources

which may jeopardize their safety and curtail the flow of information from these sources.  As a

result, I have determined that this information is properly classified at the "Secret" level, properly

withheld pursuant to E.O. 12958, as amended, §1.4 (d), and exempt from disclosure pursuant to

_____

[24] Exemption (b)(1) has been asserted to protect information  concerning foreign relations or foreign activities of the U.S. on the following pages:  NSL VIO - 4, 5, 7-9, 24-25, 699, 10726-10727, 10729-10731, 10734-10735, 10738-10740, 10742-10755, 10757, 10759-10765, and 15358-15360.

FOIA Exemption (b)(1).

## DEFENDANT'S BURDEN OF ESTABLISHING
## EXEMPTION (b)(1) CLAIMS

(58)    The information withheld in this case pursuant to Exemption 1 was examined in

light of the body of information available to me concerning the national defense and foreign

relations of the United States.  This information was not examined in isolation.  Instead, each

piece of information was evaluated with careful consideration given to the impact that disclosure

of this information will have on other sensitive information contained elsewhere in the

United States intelligence community's files, including the secrecy of that other information.

Equal consideration was given to the impact that other information either in the public domain or

likely known or suspected by present or potential adversaries of the United States, would have

upon the information I examined, and upon attempts by a hostile entity to analyze such

information.

(59)    In those instances where, in my judgment, the disclosure of this information could

reasonably be expected to cause serious damage to the national security, and its withholding

outweighed the benefit of disclosure, I exercised my prerogative as an original classification

authority and designated that information as classified in the interest of national security at the

Secret level, and invoked FOIA Exemption (b)(1) to prevent disclosure.  Likewise, the

justifications for the withheld classified information were prepared with the intent that they be

read with consideration given to the context in which the classified information is found.  This

context includes not only the surrounding unclassified information, but also other information

already in the public domain, as well as information likely known or suspected by hostile

intelligence entities. It is my judgment that any greater specificity in the descriptions and

justifications set forth with respect to the intelligence activities (including special activities),

intelligence sources or methods, or foreign relations and activities could reasonably be expected

to jeopardize the national security of the United States, and as a result, all information appearing

in these documents has been appropriately classified pursuant to E.O. 12958, as amended, and

withheld pursuant to FOIA Exemption (b)(1).[25]

## EXEMPTION (b)(2)
## INTERNAL AGENCY RULES AND PRACTICES[26]

(60)    5 U.S.C. §552 (b)(2) exempts from disclosure information "related solely to the

internal personnel rules and practices of an agency." This exemption encompasses two distinct

categories of records that are internal in nature: those involving trivial administrative matters of

---

[25] In sum, Exemption (b)(1) has been asserted on the following pages: NSL VIO - 4-5, 7-9, 24-25, 99-100, 208-209, 298, 497-499, 699-701, 799, 900, 998-999, 1401, 1601, 1603, 1700-1701, 1801, 1900-1903, 1098-2100, 2299-2301, 2463, 2493, 2499, 9850-9855,10726-10727, 10729-10731, 10734-10736, 10738-10740, 10742-10744, 10746-10748, 10750-10753, 10755-10757, 10759-10760, 10762-10765, 12352-12354, 12356-12359, 12361-12369, 12372-12406, 14283-14285, 14287-14290, 14293-14294, 14296-14297, 15348, 15350-15355, 15357-15363, 15467, 17947, 17949, 17951, 17953, 17955, 17957, 17959, 19644, 20727, 20729, 20732-20733, 23443, 23447, 23450, 23454, 27101-27106, 27109, 29099-29100, 33998, 34003, 36331-36334, 36336, 36805, 36809-36810, 35812, 36815-36817, 36819-36820, 38438-38439, 38441, and 38443-38471. Exemption (b)(1) has been withdrawn from a statutory citation which appears as footnote 2 on Bates-stamped page NSL VIO-1601.

[26] Exemption (b)(2), which previously had been applied to withhold Intelligence Oversight Board ("IOB") Case Numbers (and which are contained on pages NSL VIO - 298, 401, 497, 600, 799, 899, 997, 1301, 1401, 1600, 1800, 23443, 23447, 23450, 23454, 36331, 36805, 36811, and 36814-36815) has now been withdrawn. The assertion of Exemption (b)(2) has also been withdrawn with respect to NSL VIO-2401, where it had been applied to protect an FBI employee's FBIHQ office room number.

34

no genuine public interest ("Low" 2), and those more substantial in nature, the disclosure of

which would risk circumvention of a statute or regulation ("High" 2). The FBI has invoked

Exemption 2 (High) for nine categories of information, to include information related to

investigative techniques and procedures, secure and non-secure telephone, intranet e-mails,

addresses and facsimile numbers of FBI personnel and non-FBI federal government personnel,

FBI file numbers, code names of FBI investigations, and confidential source symbol numbers and

file numbers. All of this information appears in the context of the FBI's use of NSLs as an

investigative tool. Disclosure of these internal FBI techniques and procedures and information,

all used in the preparation, issuance and review of NSLs and NSL procedures, would impede the

effectiveness of the FBI's internal law enforcement procedures and its use of NSLs as an

effective investigative tool.

### (b)(2)-1      Information Pertaining to Investigative Techniques and Procedures

(61)      Exemption (b)(2)-1 has been cited in conjunction with Exemption (b)(7)(E)-1 to

protect information pertaining to FBI investigative techniques and procedures. This exemption

has been applied to nine sub-categories of information:

> (a) *Identities of FBI Field Offices referenced in NSLs, in documents referencing*
>
> *NSLs[27] and the identity of a squad or unit involved in a National Security*

---

[27] Exemption (b)(2)-1, category (a), has been asserted on the following pages: NSL VIO -
4-5, 7-9, 24-25, 99-101, 147, 208-209, 298, 302, 401, 497-502, 600, 699-701, 799-801, 900-901,
998-1000, 1400-1402, 1500-1502, 1600-1604, 1800-1802, 1900-1903, 2097-2100, 2497-2499,
2800, 2902-2904, 9850-9852, 9854-9855, 10726-10736, 10738, 10740, 10742, 10744-10751,
10753, 10755, 10757, 10759-10762, 12352-12372, 12379, 12386, 12395, 12400, 12406, 15350-
15363, 15467, 18767-18768, 19726-19727, 20721, 23443-23447, 23449-23456, 28642, 29833-
29836, 31795, 31924-31925, 31927-31930, 31932, 33996-33997, 33999-34003, 36805, 36807,
36809, 36811-36813, and 36817-36820.

*investigation.*[28] This information would allow a potential criminal to piece together seemingly random bits of information to form a mosaic as to how the FBI concentrates its NSL efforts. This could foster circumvention of the particular geographic areas and/or the activities of the specific squad or unit involved in the investigation.

(b) *Internet "World Wide Web" or "www" addresses and e-mail addresses of individuals under investigation.*[29] Release of this type of information would allow individuals to learn the specific e-mail accounts under investigation; armed with this knowledge, they could use other individual e-mail accounts that were not under surveillance. Individuals wanting to evade the investigation could also determine which domain or internet carriers were under surveillance and could use other domains or carriers to avoid detection and circumvent the law.

(c) *The type of investigation, Preliminary or Full Field Investigation, when referenced with an actual investigation and not in general discussion.*[30] Release

---

[28] Exemption (b)(2)-1, category (a) has also been asserted on the following pages: NSL VIO - 9850-9852, 10729, 10737, 10741, 10745, 10754-10755, 10758-10759, 10762-10766, 12352-12355, 12363, 15356, 18651, 20727.

[29] Exemption b(2)-1, category (b), has been asserted on the following pages: NSL VIO - 9850-9852, 10727, 10730-10731, 10739, 10743-10744, 10747-10748, 10751-10753, 10756-10757, 10760, 10762-10764, and 12353-12354.

[30] Exemption b(2)-1, category (c), has been asserted on the following pages: NSL VIO - 4-5, 7-9, 99-100, 208-209, 298, 497-498, 699-701, 799, 998, 1401-1402, 1800, 2098-2100, 2409-2412, 2493, 2497-2499, 2703, 2706, 9850-9852, 10734, 10738, 10742, 10746, 10750, 10755, 10759, 10762, 12353-12359, 12366-12367, 15354, 15358-15360, 15467, 23443, 23447, 23450, 23455, 36332, 36805, 36809, 36812-36813, 36816, 36819-36820.

of this type of information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation and, thus, might cause them to alter/adjust their behavior accordingly. Moreover, the knowledge that a specific activity in general warrants investigation could likewise cause individuals to adjust their behavior to avoid detection.

(d) *The specific procedures used during an investigation of an internet website and/or of an email account.*[31] Release of this information would allow individuals to know the specific types of internet and e-mail activity which are under surveillance or which would trigger a potential investigation, and could cause them to alter their behavior accordingly in order to avoid detection.

(e) *The number of carriers involved in NSL investigations and the number of phone numbers under investigation.*[32] Release of this information may allow individuals to detect the scope of the NSL program and modify their behavior according to statistical probability. For example, a lower number of carriers may suggest that the more common carriers are the ones involved in an investigation and individuals seeking to circumvent FBI investigations may then use smaller or lesser-known carriers to conduct their illicit activities in an effort to evade detection by law enforcement.

---

[31] Exemption b(2)-1, category (d), has been asserted on the following pages: NSL VIO - 2098-2100, 2702, 2705, 9850, 10763-10764, and 29678.

[32] Exemption (b)(2)-1, category (e), has been asserted on the following pages: NSL VIO - 7-9, 24-25, 998, 1000, 1800, 12361-12362, 12395, 15355, 15357, and 33994.

(f) *The number of NSLs issued during a particular year for a specific investigative file or for specific types of NSLs.*[33]  This information, if it were to be released, would reveal the size, scope and frequency of the NSL program. Armed with this information, individuals seeking to circumvent detection would be able to piece the information into a mosaic that reveals the specific law enforcement techniques and procedures used in the entire NSL program.

(g) *The procedures involved in implementation of an Interim Policy of the Attorney General's Guidelines for National Security Investigations and Full Investigations.*[34]  Release of this information, which includes practical advice on implementing law enforcement procedures, could encourage individuals who seek to circumvent detection to alter their behavior so that they would not engage in the specific activities that would trigger these law enforcement procedures.

(h) *The identity – and explanation – of a computer system utilized during national security investigations.*[35]  Release of the details of a computer system used by the FBI in its national security investigations, including the existence of the system itself, would divulge a specific law enforcement technique that could

---

[33]  Exemption (b)(2)-1, category (f), has also been asserted on the following pages: NSL VIO-14283-14285, 14287-14290, 14293-14294, 14296-14297, 15348, 15350-15351, 15352-15353, 20726-20729, 38438-38439, and 38441.

[34]  Exemption (b)(2)-1, category (g), has been asserted on the following pages: NSL VIO - 2400-2402, 2405-2406, 2463, 2493, 2497-2499, 12353, 12364, 20731-20733, 27101-27108, 33998, 34001-34004.

[35]  Exemption (b)(2)-1, category (h) has been asserted on the following pages: NSL VIO - 7-9, and 29099-29100.

allow an individual to alter his behavior in order to avoid detection by the particular system or the information that the system captures.

(i) *A copy of a proprietary agreement for services with a telecommunications firm which includes the Scope of Work, Period of Performance and references a classified Statement of Work.*[36] Publicly identifying the companies and scope of the work would reveal the specific law enforcement techniques which the FBI has employed; knowledge of this information could allow an individual to circumvent detection by altering his behavior accordingly.

Thus, because release of all of the foregoing information could reasonably be expected to impede the FBI's effectiveness of its law enforcement techniques and procedures and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(2)-1.[37]

### (b)(2)-2    Secure/Non-Secure Telephone and Facsimile Numbers of FBI Personnel

(62)    Exemption (b)(2)-2 has been asserted to protect internal telephone and facsimile

---

[36] Exemption (b)(2)-1, category (i) has been asserted on the following pages: NSL VIO-15958-15969, and 22185.

[37] Exemption (b)(2)-1 has been asserted in the aggregate on the following pages:  NSL VIO-4-5, 7-9, 24-25, 99-101, 208-209, 298, 302, 401, 497-502, 600, 699-701, 799-801, 900-901, 998-1001, 1400-1402, 1500-1502, 1600-1604, 1800-1802, 1900-1903, 2098-2100, 2400-2402, 2405, 2409-2412, 2463, 2493, 2497-2499, 2603, 2702, 2705-2706, 2800, 2902-2904, 9850-9852, 9854-9855, 10726-10766, 12352-12372, 12379, 12386, 12395, 12400, 12406, 14283-14286, 14287-14290, 14293-14294, 14296-14297, 15350-15363, 15467, 15958-15969, 17947-17960, 18651, 18767-18768, 19726-19727, 20721, 20726-20729, 20731-20733, 22185, 23443-23447, 23449-23456, 27101-27108, 28642, 29099, 29678, 29833-29836, 31448-31451, 31795, 31924-31925, 31927-31932, 33994, 33996-34004, 36331-36336, 36805, 36807, 36809, 36811-36813, 36816-36820, 38437-38439, 38441, and 38443-38471.

numbers of FBI personnel. Telephone and fax numbers are used by FBI personnel while they are

working on significant national security and criminal investigations. Disclosure of these

telephone and facsimile numbers could subject these individuals to harassing telephone calls or

facsimiles which could disrupt official business (including impeding the ability of Special Agents

to conduct and conclude functions related to the law enforcement investigations in a timely

manner). Accordingly, because disclosure of these internal numbers could impede the FBIs

effectiveness and may risk circumvention of the law, the FBI has properly withheld this

information pursuant to Exemption (b)(2)-2.[38]

### (b)(2)-3      FBI File Numbers

(63)    FBI file numbers are significant internal administrative management tools used for

the purpose of organizing case-related information, such as correspondence, reports and other

investigative material. They are internal identifiers for the repositories of the FBI's investigative

information and are used for administrative control and efficient retrieval of information.

Moreover, each FBI investigation is assigned a particular file number series, and specific

meaning is associated with that file number. For example, the "190" file series designates

FOIA/Privacy Act matters at the administrative stage. A vast majority of the FBI's file numbers

---

[38] Exemption (b)(2)-2 has been asserted on the following pages: NSL VIO-4, 7, 24, 99, 147, 208, 298, 401, 497, 600, 699, 799, 997, 1301, 1401, 1600, 1701, 1800, 1900, 1902, 2098, 2299-2300, 2409-2412, 2491, 2501, 2707, 2800, 2904, 3107, 3109, 10726, 10728, 10731, 10736, 10738, 10742, 10744, 10746, 10748, 10750, 10755, 10757, 10759, 10761-10762, 10765, 12352-12357, 12359-12360, 12362-12363, 12367, 12372, 12379, 12386, 12395, 12400, 12406, 15347-15349, 15352, 15354, 15358, 15360, 15467, 19645, 23443, 23447, 23450, 23454, 27100, 28642, 28708, 29100, 29400, 31925, 31927, 31930, 33994-33996, 34001, 36805, 36811, 36817, 36819, and 38437.

are attached to a detailed array of counterintelligence, counterterrorism, and criminal investigations. Release of these numbers would impede the FBI's operations as these numbers would alert the public to the particular types of investigations on which the FBI is working. Individuals who learn that the FBI has worked on a particular type of investigation could capitalize on that information and adjust their behavior to evade detection and circumvent the particular techniques employed in that investigation. As a result, the FBI has appropriately withheld this information pursuant to Exemption (b)(2)-3.[39]

### (b)(2)-4        Secure FBI Address

(64)    Exemption (b)(2)-4 has been asserted to protect the identity of a secure FBI office location. The identification of a secure facility where the FBI is conducting investigations; and collecting investigative and source material could be used by a criminal to compromise FBI operations. Besides the obvious threat to the physical safety of FBI employees, release of the facility location could also equip a hostile subject or target with details about where such investigations are conducted. Consequently, because disclosure would impede the FBI's operations and potentially aid in circumvention of a national security-related investigation, the FBI properly withheld this information pursuant to Exemption (b)(2)-4.[40]

### (b)(2)-5        Secure Intranet or E-mail Address of FBI Employee

---

[39] Exemption (b)(2)-3 has been asserted on the following pages: NSL VIO - 99-100, 208, 298, 498, 699, 701, 799, 1800, 1901-1903, 2097-2098, and 2463.

[40] Exemption (b)(2)-4 has been asserted on the following pages: NSL VIO -1600 and 2299.

41

(65)    Exemption (b)(2)-5 has been asserted to protect secure internal e-mail and website addresses of FBI personnel.  Secure internal e-mail and web site addresses are used by FBI personnel during the daily performance of their jobs.  Disclosure of this information would expose the FBI to the possibility that computer-savy individuals could compromise the effectiveness of the FBI's internal computer system by devising ways in which to access – and tamper with – the system without detection.  Release of this information therefore would reveal vulnerable internal information and impede the effective use of such an internal system. Accordingly, because these internal computer addresses are related to the FBI's internal practices and because disclosure could impede the FBI's effectiveness, the FBI has properly withheld this information pursuant to Exemption (b)(2)-5.[41]

### (b)(2)-6        Code Name of FBI Investigation

(66)    Exemption (b)(2)-6 has been asserted to protect FBI investigation code names. These code names are assigned internally to investigations.  Code names reflect the subject of the investigation in that the code is often an abbreviated version of the investigative subject itself. Release of a code name would reveal the focus of the FBI's investigation which may cause harm to an investigative interest of the FBI.  Armed with this knowledge, criminals could alter their behavior to avoid detection and inhibit the FBI's law enforcement efforts to investigate their criminal conduct.  Thus, the FBI properly withheld this information pursuant to Exemption

---

[41] Exemption (b)(2)-5 has been asserted on the following pages:  NSL VIO-2602, 2606, 2707, 28642, and 31449.